(C. D. 1515)

Marconi International Marine Communications Co., Ltd. *v.*
United States

## United States Customs Court, Second Division

(Decided April 9, 1953)

*Jordan & Klingaman* (*Jacob L. Klingaman* of counsel); *Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel), associate counsel; for the plaintiff.

*Charles J. Wagner*, Acting Assistant Attorney General (*Richard H. Welsh* and *Richard M. Kozinn*, special attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: The imported merchandise which forms the subject of this controversy consists of an echometer projector complete with gaskets designed for use as part of a depth-sounding device. It is composed of 71 parts which were classified pursuant to the provisions of paragraph 368 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 368) and of the same paragraph, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, and duty was assessed thereon at the appropriate rate in accordance with those provisions.

For greater convenience, the pertinent portions of the foregoing provisions of the statute are here quoted in reverse order:

Paragraph 368 (a) (1), (2), and (3), as modified, *supra*:

Ships' logs, standard marine chronometers having spring-detent escapements, and depth-sounding mechanisms, devices, and instruments; all the foregoing intended or suitable for measuring time, distance, or speed, whether or not in cases, containers, or housings, and valued at more than $10 each.   -   $1.15 each and 17½% ad val.

Paragraph 368:

\*       \*       \*       \*       \*       \*       \*

(c) Parts for any of the foregoing shall be dutiable as follows:

\* \* \* \* \* \* \*

(3) each assembly or subassembly (unless dutiable under clause (1) or (4) of this subparagraph) consisting of two or more parts or pieces of metal or other material joined or fastened together shall be subject to a duty of 65 per centum ad valorem and, in addition, to a duty of 3 cents for each such part or piece of material, \* \* \* ; .

\* \* \* \* \* \* \*

(5) no assembly or subassembly shall be subject to a greater amount of duty than would be borne by the complete movement, mechanism, device, or instrument for which suitable;

The sole claim relied upon by plaintiff herein is that the projector should have been classified as electrical signaling apparatus in chief value of metal pursuant to paragraph 353 of said act (19 U. S. C. § 1001, par. 353), as modified, *supra*, and assessed with duty at the rate of 15 per centum ad valorem. The specific language of said modification reads as follows:

Electrical apparatus, instruments (other than laboratory), and devices, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

\* \* \* \* \* \* \*

Signaling, radio, welding, and ignition_____ 15% ad val.

Other claims made in the protest or by amendment thereto were abandoned.

When this case was called for trial, it was stipulated between counsel for the parties that the subject matter of this controversy which is designated on the invoice as "Echometer projector type 832 complete with gaskets" is composed in chief value of metal.

Richard Cardwell Griffiths was the first of two witnesses who testified on behalf of plaintiff. He stated that at the time of importation of the merchandise in issue, he was assistant to the manager of the New York office of the plaintiff company and saw the article when it was imported. He identified plaintiff's exhibit 1 as the actual echometer projector with the exception of the rubber gaskets which are not a part of the item but are used for the sealing of the box in which it is fitted. The court gave permission that said exhibit 1 might be withdrawn at the conclusion of the hearing. The witness then identified plaintiff's exhibit 2 as a scale drawing illustrative of the controverted merchandise except that the illustration is of French manufacture whereas the imported article was produced in England. The witness added that there are no differences whatsoever between the article represented by exhibit 1 and that illustrated by exhibit 2 and that the size and construction were identical, the projector part of the echometer being outlined in green on said exhibit 2. The witness identified page 43 of a pamphlet entitled "Marconi Sounding

Device Co., Ltd., Technical Instructions, Echometers Type 414, 421 & 421*, S. D. 2/40," which was received in evidence as exhibit 3 to illustrate the entire echometer of which exhibit 1 is an essential part.

Geoffrey Wickes Flash, the second of plaintiff's witnesses, when called to testify stated that he has been the chief inspector at New York for the past 24 years of the Marconi International Marine Communications Co., Ltd., his duties consisting of supervision, inspection, maintenance, repair, and installation of equipment supplied by his company. Prior thereto, he had been inspector on marine communications equipment with the Radio Marine Corp. of America for a period of 3 years and, previous thereto, for a like period of time, had been a seagoing radio officer on both cargo and passenger vessels. He stated that his first experience with echometers was approximately in 1931. Since that time, he has been in frequent contact with echometers inasmuch as the average cargo vessel from 5,000 tons up is so equipped, and from 30 to 50 such vessels arrive in the port of New York monthly. They are generally inspected on arrival to determine their condition and operation, and, where repairs are required, they are carried out by this witness or his assistant. The witness stated that exhibit 1 is essential to the operation of an echometer. When asked to describe what an echometer actually is, he stated—

An echometer is a device for emitting a signal, in a downward direction towards the bed of the ocean, which is reflected from the ocean floor or any other object, which may intervene between the vessel, where the equipment is installed, and the ocean floor. This signal upon returning with any other information that it has gathered in its trip to the bottom is returned to the vessel where the projector is installed, and there the signal is reconverted from an electrical—from a sound signal into an electrical signal, which is amplified and displayed in a visual manner.

Continuing his explanation, he stated—

* * * The electrical impulses are converted by Exhibit 1 from an electrical impulse to a supersonic sound signal and it is the supersonic sound signal which proceeds to the bottom through the water at a predetermined rate of speed, controlled by the natural laws or wave length of the water and of the frequency of the electrical pulse initiating it.

He added that the projector is placed in the bottom plates of a ship— in the hull—generally near the keel.

The witness testified that an echometer determines depth by the length of time taken by the sound wave and that the pressure, temperature, and salinity of the water have an effect upon the calculation, which determination would approximately be accurate, plus or minus 2 per centum. In rough weather, the returning echo might be blocked off completely by the air bubbles in the water.

The witness stated that an echometer rectifies or distributes electrical energy in the following manner:

It does that by what is known as piezo-electric activity, which is the ability of a quartz crystal to convert or vibrate under electrical stimulation and it is the vibra-

tion, that the frequency determined by the thickness of the crystal itself that determines the frequency or pulse rate of the emitted signal, and the one selected has been found to be the most effective one for travelling through water.

\*      \*      \*      \*      \*      \*      \*

The instrument as a whole institutes the electrical pulse which is transmitted to Exhibit 1. Exhibit 1 then emits the supersonic signal which travels to the bed of the ocean and is reflected therefrom. In returning, the supersonic sound signal strikes the face of the unit and vibrates mechanically those crystals to a slight degree, converting the pulse of sound signal back into electrical energy and also providing additional information, such as the topography of the ocean bed itself by graph information, and any other objects which may intervene so that the information returned by the signal gives us the contour of the ocean bed. The presence of any other objects, such as a school of fish under the ship, as well as an approximate distance, and gives us a general idea of the geography of the ocean floor.

The witness continued his testimony by stating that the electrical energy is returned to the bridge in the following manner: On striking the unit, the sound signal is converted back to an electrical pulse which, because of its weakness, is amplified and subsequently displayed on a graph produced by a stylus operating at a predetermined speed on a continuously moving roll of paper. By this means, a relation between depth and display can be established and an approximate depth indicated. The type of bottom may be determined to a degree by the nature of the line produced by the stylus—a hard bottom would be represented by a sharply defined line, while a soft mud bottom would be shown by a wide blurred line. In addition, if other objects would intervene between the bottom and the vessel itself, the graph indication would disclose marks somewhere on the scale between the point of departure and the point of return so that intervening objects, such as fish, would be indicated at their approximate depth or distance below the vessel.

The witness further testified that about 80 per centum of passenger and cargo ships are presently equipped with echometers. The echometer depicts what is directly under a vessel but not what is in front or in back of it. In addition to giving the depth under a vessel, the use of an echometer makes it possible for coast and geodetic survey organizations or mapmakers to chart the ocean bed, and it also enables fishermen to locate schools of fish.

Plaintiff's exhibits 4 and 5, each consisting of a graph produced on an echometer, were received in evidence as showing depth and type of bottom. Also received in evidence were plaintiff's exhibits 6 and 7 which are graphs indicating the presence of fish.

The witness stated that it is conceivable that there are depths beyond which the echometer would not reach but that there are models designed to operate up to 3,000 fathoms, or 18,000 feet.

Flash stated that the echometer is used primarily as an aid to navigation and that the instrument of which exhibit 1 is a part is as accurate as it is possible to make it. He also stated that the apparatus

serves an important function as well in the fishing industry. He further testified that the echometer does not provide an accurate reading at very shallow depths, meaning any depth less than 2 fathoms, or 12 feet, the reason being that the number of echoes returned are so great that the chart becomes too blurred to give an accurate indication.

From the foregoing exposition of the testimony offered in this case, it would appear that the weight of evidence supports the decision of the collector in holding that the imported article is part of a depth-sounding mechanism, device, or instrument.

The record discloses that an echometer, of which the imported article forms an essential part, may serve one of three functions; (1) depth sounding; (2) indicating to fishermen the location of schools of fish; (3) aiding the coast and geodetic service and like organizations in plotting the topography of the ocean bed.

It appears that the primary function of the mechanism is depth sounding inasmuch as early in the testimony of the witness Flash it was stated that the average cargo vessel from 5,000 tons up is so equipped, and, later, that echometers are part of the equipment of approximately 80 per centum of all passenger and cargo vessels and that said equipment is used primarily as an aid to navigation. It is apparent from the evidence that the use of an echometer by fishermen in locating fish and by cartographers in charting the ocean bed is secondary to the chief use to which the mechanism is dedicated aboard ships as a depth-sounding device, and it is the chief use of the article which must control its classification. (*Petry & Co.* v. *United States*, 3 Ct. Cust. Appls. 348, T. D. 32906.)

In support of its claim for classification as parts of an electrical signaling device within the provisions of paragraph 353, *supra*, plaintiff relies on the case of *United States* v. *United Geophysical Company*, 38 C. C. P. A. (Customs) 137, C. A. D. 451. That case is distinguishable. The importation there in question was radar equipment for which there was no specific provision in the tariff act and also for the compelling reason that it was found that the primary function of the device was to detect objects rather than to measure distances.

Plaintiff in its brief endeavors to draw an analogy to the *United Geophysical* case by contending that an echometer is a "locator" rather than a distance-measuring instrument on the ground that "Once an identifiable shoal or underwater ridge is located, or once a school of fish is detected, or once the type of ocean bottom is determined, the echometer has served its purpose; further accuracy showing actual depth is unimportant." This contention, however, would appear untenable in view of the testimony before us which indicates conclusively that an echometer is principally a depth-sounding device, for which there is specific provision in paragraph 368, as modified, *supra*.

On the basis of relative specificity between the competing provisions of paragraph 368 and paragraph 353, *supra*, plaintiff relies upon the case of *United States* v. *Herman H. Sticht & Co.*, 22 C. C. P. A. (Customs) 40, T. D. 47048, where the issue was the proper classification of certain indicators which were attached to the transmitter of a radiotelegraph apparatus to indicate the average number of words transmitted during a given time. The merchandise had been classified as a "mechanism, device, or instrument intended or suitable for * * * indicating * * * the speed of arbors * * * or similar uses" within the provisions of paragraph 368 (a) of the Tariff Act of 1930 and was held to be properly subject to duty as a part of "electrical telegraph * * * radio, * * * devices," as provided in paragraph 353 of said act. The rationale of the court's conclusion was that when Congress provided *eo nomine* for telegraph and radio apparatus, and parts thereof, in paragraph 353, it intended that all such should be dutiable thereunder, unless more specifically described elsewhere in the tariff act. It was the court's opinion that the articles there in question were more specifically described as parts of electrical telegraph or radio apparatus than as devices for indicating the speed of arbors, or having similar uses, and should be classified within the provisions of said paragraph 353.

If we were to consider that an echometer of which the present importation is a part would be encompassed by the provision for electrical signaling apparatus in paragraph 353, as modified, *supra*, as claimed by plaintiff herein, and also by the provisions of paragraph 368, as modified, *supra*, we would be led to the conclusion that the latter classification must prevail. The provision for "depth-sounding mechanisms, devices, and instruments" in paragraph 368, as modified, *supra*, and the provision for electrical signaling apparatus in paragraph 353, as modified, *supra*, are both use provisions but the former, being more descriptive of the article in controversy and specifically indicative of its chief use, would control its classification.

Counsel for defendant in its brief makes reference to the following pertinent excerpts from the Digests of Trade Data (1938) prepared in connection with the trade agreement between the United States and the United Kingdom, 74 Treas. Dec. 253, T. D. 49753, and from the Summary of Tariff Information (1948):

From Digests of Trade Data, *supra*, Volume IV, Schedule 3, page 3–122:

*General statement*

The nautical or navigational instruments discussed herein are dutiable under paragraph 368 as devices suitable for measuring time, distance, or speed. This provision and a definition of the size of clock movements (not less than 1.77 inches in width, contained in paragraph 367 (a)) limit the articles to standard marine chronometers, depth-sound apparatus, ships' logs, and tachometers.

\* \* \* \* \* \* \*

*Description and uses*

\*    \*    \*    \*    \*    \*    \*

*Depth-sounding apparatus is of three types.* One records depth by means of a pressure tube which is sunk to the bottom. A second records depth by the action of a sinking impeller. *The third type operates on the echo principle.* [Italics supplied.]

From Summary of Tariff Information, *supra*, Volume 3, Part 3, page 265:

\* \* \* Depth-sounding devices, all of which are used to measure and indicate depth, also are of three types. One type operates by means of a pressure tube sunk to the bottom, another by the action of a sinking impeller, and a third on the echo principle.

\* \* \* All three types of depth sounders continue to be used, but *the echo type apparatus is becoming increasingly common as it provides more accurate readings at high speeds than does either of the other types.* [Italics supplied.]

From the foregoing it is apparent that echometers are recognized as depth-sounding devices and that they are intended to be covered by the provisions of paragraph 368 (a) (1) (2) and (3), as modified, *supra*, as classified by the collector of customs.

After due consideration of the many cases cited by counsel for the parties in their well-prepared briefs filed herein, we find nothing to disturb the conclusion we have reached.

Upon the record before us, we have no alternative but to sustain the classification of the collector. The claim of plaintiff for classification within the provisions of paragraph 353, as modified, *supra*, is overruled. All other claims in the protest having been abandoned are dismissed.

Judgment will issue accordingly.